NOTICE
Decision filed 03/06/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230422-U

NO. 5-23-0422

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Coles County. |
| | ) | |
| v. | ) | No. 05-CF-137 |
| | ) | |
| BOBBY G. STEFFENS, | ) | Honorable |
| | ) | Mitchell K. Shick, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Moore and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction and sentence on the offenses of predatory criminal sexual assault of a child, where the State's errors did not amount to first-prong plain error, and defense counsel did not render ineffective assistance of counsel.

¶ 2    Following a jury trial in the circuit court of Coles County, defendant, Bobby G. Steffens, was convicted of six counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2004)) and sentenced to mandatory natural life in prison. Defendant appeals, arguing that the State improperly elicited the opinions of witnesses regarding the credibility of the minor children, J.P. and C.V.; the State improperly commented on J.P. and C.V.'s credibility during closing argument; and trial counsel rendered ineffective assistance of counsel by failing to

1

object to the State's errors. Alternatively, defendant requests this court consider these errors under the plain-error doctrine. For the following reasons, we affirm.

¶ 3                                    I. Background

¶ 4      We limit our recitation to those facts relevant to our disposition of this appeal. We will recite additional facts in the analysis section as needed to address defendant's specific arguments.

¶ 5      On March 18, 2005, the State charged defendant with three counts of predatory criminal sexual assault of a child (*id.*), all Class X felonies, alleging that, from approximately October 2004 through March 2005, defendant, an individual 17 years of age or older, committed an act of sexual penetration with J.P., his stepdaughter and an individual under 13 years of age, when defendant placed his finger in J.P.'s vagina (count I), placed his mouth on J.P.'s vagina (count II), and placed his penis on J.P.'s vagina (count III). The State subsequently charged defendant on May 6, 2005, with three counts of predatory criminal sexual assault of a child (*id.*), all Class X felonies, alleging that, from approximately October 2004 through March 2005, defendant committed an act of sexual penetration with C.V., his stepdaughter and an individual under 13 years of age, when defendant placed his finger in C.V.'s vagina (count IV), placed his penis in C.V.'s mouth (count V), and placed his penis on C.V.'s vagina (count VI).

¶ 6      On September 2, 2005, the trial court held a hearing on the State's motion to admit hearsay evidence, pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10(b) (West 2004)),[1] of J.P. and C.V.'s out-of-court statements made to Betty Christine

---

[1]Section 115-10(b) of the Code provides that certain evidence shall be admitted as an exception to the hearsay rule under the following circumstances: "(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and (2) The child *** either: (A) testifies at the proceeding; or (B) is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement[.]"

Best, Detective Jason Taylor, Brenda Steffens, and Noelle Cope. The following evidence was adduced.

¶ 7    A. Betty Christine Best

¶ 8    The State called Betty Christine Best, a school social worker at C.V.'s elementary school, who testified to the following. Ms. Best spoke individually with C.V. after C.V. asked a female classmate if C.V. could live with her family. During the interview, C.V. admitted that she wanted to live with her female classmate because defendant, her dad, spanked her and her siblings with a paddle and put them to bed early. C.V. also reported that defendant "like[d] to pat [her] kitty cat." C.V. then placed her hands near her pelvic area to show Ms. Best the location of her "kitty cat." Upon further inquiry, C.V. said that defendant "liked to rub it[,] and tr[ied] to put his fingers up inside of her." C.V. stated that her mother did not know about defendant's touching. Defendant touched J.P. in front of C.V., but C.V. did not know if defendant touched her younger brother, J.V. Ms. Best did not believe that someone coached C.V. prior to the interview. Rather, C.V. used her own words and terminology when explaining how defendant touched her. Ms. Best specified that C.V. was in a "cross categorical program" for children with severe learning disabilities or mild mental impairment. Despite C.V.'s disability, Ms. Best believed that C.V. adequately verbalized her experience and did not embellish her story. Following Ms. Best's testimony, the trial court determined that C.V.'s statements to Ms. Best provided sufficient safeguards of reliability to admit C.V.'s statements pursuant to section 115-10 of the Code.

¶ 9    B. Detective Jason Taylor

¶ 10    Detective Jason Taylor, a lieutenant with the Mattoon Police Department, testified that he interviewed C.V. on March 15, 2005, regarding a possible criminal sexual assault. Detective Taylor testified that, due to C.V.'s "developmental[ ] disab[ility]," he did not tape C.V.'s interview

3

because he found it hard to communicate with her. Detective Taylor explained that C.V. sometimes provided him three answers to the same question. Based on what C.V. shared with him, he stated that he "wasn't totally convinced that an offense had taken place." Detective Taylor detailed that C.V. reported that defendant placed his finger in her "kitty cat" at night in her bedroom on 10 or 11 occasions. C.V. pointed to "the area between her legs" when Detective Taylor inquired about the location of her "kitty cat." C.V. stated that defendant came into her bedroom when her mother was at the store or in another room playing a video game. According to C.V., defendant placed his penis in her vagina on occasion. C.V. later stated that defendant "had not placed his penis into her vagina on occasion." C.V. indicated that defendant " 'gets his private out and plays with it a little bit and then humps us.' " Upon further inquiry, C.V. stated that defendant "put his penis into her vagina." Detective Taylor shared that C.V. "was all over the roadway in her statement." C.V. initially stated that defendant started touching her in kindergarten. Next, she shared that defendant touched her between kindergarten and March 2005, and then also stated that defendant touched her between kindergarten and prior to 2005. C.V. could not pin down a particular time when the offenses took place. Detective Taylor did not believe that someone coached C.V. or rehearsed with her prior to the interview.

¶ 11     Detective Taylor also interviewed C.V.'s older sister, J.P., on March 15, 2005. Detective Taylor taped J.P.'s interview, noting that he did not have trouble communicating with her. J.P. told Detective Taylor that defendant placed his fingers in her vagina on 10 to 11 occasions, placed his tongue into her vagina on eight to nine occasions, and placed his penis "slightly" into her vagina on one occasion. J.P. reported that defendant would "get drunk and pull her pants down, forcibly, and place his tongue in her vagina against her will." J.P. reported that defendant came into her bedroom at night when her mother was at the store or in another room. While in her room,

4

defendant would place his middle finger into J.P.'s vagina, sharing that J.P. told him that defendant used his "longest finger *** [to] check[ ] to see if [J.P.] had ever been molested." In addition, J.P. stated that defendant "caught her in the living room" on one occasion, pulled down her pants, and tried to insert his penis into her vagina. J.P. reported that defendant only slightly inserted his penis into her vagina because she kicked and screamed until defendant stopped. J.P. confided in her mother about defendant's actions. According to J.P., her mother informed her that she "would put a stop to it but never did." Detective Taylor did not believe that someone coached J.P. or rehearsed with her prior to the interview.

¶ 12     Following Detective Taylor's testimony, the trial court determined that J.P.'s statements to Detective Taylor provided sufficient safeguards of reliability to admit her statements pursuant to section 115-10 of the Code. The court, however, did not allow Detective Taylor's testimony regarding C.V.'s out-of-court statements because "there [was] not a recording, the fact that the officer, himself[,] said that the child contradicted herself on multiple occasions, is not a consistency in a statement of facts ***."

¶ 13     C. Brenda Steffens

¶ 14     Brenda Steffens, J.P. and C.V.'s biological mother and defendant's wife, testified that both of her daughters told her that defendant touched them. Specifically, J.P. told Brenda privately that defendant " 'touch[ed] [her] in a way that [she] don't [*sic*] feel is comfortable or right.' " The first time she complained to Brenda about defendant, J.P. did not provide specific allegations. The next night, however, J.P. complained that defendant touched her. Upon hearing this, Brenda told J.P. to take a shower. When J.P. finished her shower, she sat on the toilet with her nightgown over her knees. Defendant walked into the bathroom and told J.P., who was sitting on the toilet, " 'Oh, while you are down there, suck it.' " On a third occasion, Brenda, who was in the bathroom with

5

J.P., heard defendant say to J.P., " 'Oh, while you are down there, suck it.' " Brenda testified that she saw defendant in J.P. and C.V.'s shared bedroom at night on 15 to 25 occasions between 10:30 p.m. and 11 p.m. When Brenda asked defendant to leave J.P. and C.V.'s bedroom, defendant told Brenda to "shut the 'f' up, get the 'f' out of there." Brenda also testified that C.V. told her privately that defendant " 'touch[ed] [her] in a way that is not right and [she was] uncomfortable.' " C.V. did not provide specific allegations. Both J.P. and C.V. asked Brenda to " 'turn [defendant] in, call the police on him,' " but Brenda feared defendant would kill her and her three children.

¶ 15    On cross-examination, Brenda acknowledged that she pled guilty for permitting defendant's sexual assaults of her children in her home. In addition, she acknowledged that she agreed to testify against defendant as part of her agreement with the State. On redirect examination, Brenda testified that she reported her knowledge of defendant's abuse of J.P. and C.V. to law enforcement and the Illinois Department of Children and Family Services prior to her arrest. Following Brenda's testimony, the trial court determined that J.P. and C.V.'s statements to Brenda provided sufficient safeguards of reliability to admit their out-of-court statements to Brenda pursuant to section 115-10 of the Code.

¶ 16    D. Noelle Cope

¶ 17    Noelle Cope, a pediatric family nurse practitioner at Sarah Bush Lincoln Health Care Center, testified to the following. During C.V.'s interview, C.V. referred to her vagina as her "kitty cat." C.V. said that defendant pulled down her pants and tried to "shove his finger up [her] kitty cat." C.V. indicated that defendant touched her " '[a] lot' " and that he hurt her. C.V. denied that defendant touched her butt. C.V. shared that she saw defendant's "privates" when " '[h]e tried to put his private in my kitty,' " which hurt her. Nurse Cope testified that "when she said yes [that defendant's touch hurt her], she said it very loudly and her eyes just got rather large when she said

6

that." C.V. also stated that defendant " 'put his private in her mouth until white stuff would get on the floor [of her bedroom] from his private.' " In addition, C.V. stated that defendant put his mouth on " 'her kitty.' " C.V. indicated that defendant touched her in their home when her mother was at a store and in another room. C.V. saw defendant touch J.P. and J.V. C.V. shared that she told "[a] counselor" about defendant's inappropriate touching. Following the interview, Nurse Cope performed C.V.'s sexual abuse examination, which came back "normal," sharing that it "[was] not unusual, with the allegations that she described, to have a normal examination."

¶ 18    During J.P.'s interview, J.P. stated to Nurse Cope that defendant "kept playing with [her] in inappropriate ways." J.P. specified that defendant "kept trying to stick his fingers up in [her]" vagina, referring to her vagina as " 'her kitty.' " J.P. would yell at defendant to stop, but he would tell her to "shut up. 'You know you like it. You know you want me to do this to you.' " J.P. indicated that she told him " 'No, I don't.' And then, [her] mom would come in the room and tell [defendant] to quit it. Mom saw [defendant] put his hands up [her] front a couple of times." Defendant also asked J.P. to " 'suck his thing several times' " in the bathroom, at which time Brenda would come in the bathroom and say, " '[J.P.] needs to go to the bathroom, leave her alone.' " Defendant also tried " 'a couple of times' " to put his penis in J.P.'s vagina, but his penis " 'wouldn't go in.' " J.P. shared that defendant touched her for the past six to seven months, shortly after she moved in with her mom and defendant. When J.P.'s mother asked defendant to stop touching her, defendant would say that he "was *** checking to see if anyone else had been messing with us." J.P. shared that both her and Brenda saw defendant " 'kissing [C.V.'s] stomach and lower parts after raising her nightgown.' " Brenda told defendant to leave C.V. alone after this incident. J.P. stated to Nurse Cope that defendant " '[u]sually' " abused her and C.V. at night. J.P.

7

also shared that she saw defendant touch J.V.'s penis, noting that defendant "was always twisting [J.V.'s] winkie."

¶ 19    After the interview, Nurse Cope performed a sexual abuse examination of J.P. that came back with a "positive physical finding." Nurse Cope specified that, due to penetrating trauma, J.P. had a split in her vaginal hymenal tissue. Consistent with J.P.'s interview, Nurse Cope testified that a finger or penis could have caused the penetrating trauma to J.P.'s hymen. Following Nurse Cope's testimony, the trial court determined that J.P. and C.V.'s statements to Nurse Cope provided sufficient safeguards of reliability to admit the minor children's statements pursuant to section 115-10 of the Code.

¶ 20    On September 13, 2005, the trial court held defendant's jury trial, and the following evidence was adduced.

¶ 21    A. J.P.

¶ 22    The State called J.P., defendant's stepdaughter and alleged victim in the case, who testified to the following. J.P., who was 13 years old at the time of her testimony, currently lived with a foster family. Prior to her placement in foster care, she lived in Mattoon, Illinois, from August 2004 until April 2005, with her mother, defendant, and two younger siblings, C.V. and J.V. J.P. testified that she "didn't really get along" with defendant because of "the way that he was treating us." J.P. elaborated that defendant "would touch us the ways we didn't really want to be touched," stating that defendant touched her vagina by putting "his finger *** up [her] shorts and [her] underwear and try[ing] to get his finger in [her] vagina." According to J.P., defendant placed his finger in her vagina "several times" and also rubbed her leg, stomach, and breast area. When J.P. instructed him to stop, defendant said, "No, you like it too much."

8

¶ 23    Defendant also touched J.P. with his penis on one occasion when he tried to insert his penis into her vagina on a sectional couch. During this interaction, defendant pulled down his pants and exposed his penis to her. Defendant also pulled down her pants and "[sat] down on *** top of [J.P.] or like la[id] on top of [her]" in an attempt to insert his penis inside her vagina. Defendant could not insert his penis into J.P.'s vagina while she moved around and "tr[ied] to get away" from him. As a result, defendant touched his penis to the top of her vagina. J.P. also recalled an incident when she finished taking a shower, and defendant pushed her down and made her sit on a ledge of the tub. Defendant then "stuck his tongue on [her] vagina," while he had his hands "[o]n the edge of the walls *** [to] hold himself up." J.P. clarified that defendant did not touch her on the "inside [of her vagina], but like around the inside part of it." According to J.P., defendant touched her "[a]lmost every night" in her bedroom that she shared with C.V.

¶ 24    J.P. testified that she told her mother that defendant inappropriately touched her, sharing that her mother saw defendant rub J.P.'s legs and "get[ ] close[ ] to *** [her] vagina" several times. J.P. testified that defendant "threatened to kill [J.P. and C.V.] several times" if they told anyone about him touching them. J.P., who was scared of defendant, believed his threats after she saw defendant threaten to kill her mother. J.P. testified that she saw defendant "stab[ ] three holes in the wall [with a knife] and *** yell[ ] at [her] mom." J.P. testified that defendant also touched C.V. in the living room when defendant had his hand "up [C.V.'s] nightgown and was messing around with her underwear and around her chest area, around her stomach."

¶ 25    B. C.V.

¶ 26    Next, the State called C.V., defendant's stepdaughter and alleged victim in the case, who testified to the following. C.V., who was nine years old at the time of her testimony, testified that she lived with a foster family. C.V. testified that she promised to tell the truth. She, however, did

not know what telling the truth or the word " 'honest' " meant. C.V. then stated that she had lived with her current foster family for 13 years. Upon further questioning, C.V. stated that she struggled to tell "times and lengths." She then testified that defendant "stuck his finger up [her] private" "every night." C.V. shared that defendant snuck into the bedroom she shared with J.P. when they were both asleep. C.V. would then "fe[el] something down below my private," referring to her vagina. She recalled that defendant would stick "his middle finger up my private." Defendant also touched C.V. with "his private in mine," referring to his penis. C.V., however, could not remember what defendant did with his "private." C.V. initially stated that both her and defendant kept their clothes on, and then said that defendant took her clothes off. Later in her testimony, C.V. stated that defendant only touched her with his finger and no other body part. Initially, C.V. spoke to Ms. Best, but she could not remember what she told her. She then testified that she talked to Ms. Best "[t]o get [defendant] in jail," "[b]ecause [she] didn't want to see him anymore," sharing that she wanted defendant to stop touching her. C.V. did not tell her mother what defendant did to her, but she told her mother that defendant bothered her. C.V. shared that she did not get along with defendant when she lived with him because he spanked her with a wood paddle, and she was scared of him.

¶ 27   C. Brenda

¶ 28   On September 14, 2005, the State called Brenda, defendant's wife of three years and the mother of J.P. and C.V., who testified to the following. Brenda testified that J.P. did not report any issues with defendant after she moved to their home. However, in February 2005, Brenda recalled standing in the kitchen when she saw defendant in the living room "putting his hand up [J.P.'s] shorts and up her T-shirt." Brenda did not speak up at that time, but she recalled J.P. "just looked at me like, Mom, please help." Brenda asked J.P. to come into the kitchen, but J.P. "was trembling

10

and looking at me with those sad eyes, hurtful eyes." Brenda did not discuss this interaction with J.P. However, J.P. later informed Brenda that defendant "touched her in a way that made her feel uncomfortable" in her bedroom. J.P. did not provide specifics at that time. Brenda then confronted defendant, but he said J.P. lied. Brenda also testified that J.P. told her that defendant came into the bathroom one night after she showered and stated the following to her: "Oh, while you're down there, suck it, and then that night he came in and said it again to her, and I was in the bathroom behind the bathroom door[,] and I heard it myself." Although Brenda confronted defendant about what she heard, defendant denied it. According to Brenda, J.P. told her two times that defendant scared her.

¶ 29   Brenda testified that she did not take any action against defendant because defendant "constantly threaten[ed] to kill [her] and my kids if anything was said" about defendant's abuse of the minor children. Brenda testified that she pled guilty for permitting defendant's sexual assault of her children. Brenda admitted that her fear of defendant caused her to delay reporting defendant's actions to the authorities. Brenda testified that defendant threatened her on multiple occasions, sharing that he threatened to stab her with scissors and a steak knife and also "put charcoal starting fluid on [her] shirt sleeves and *** threaten[ed] to set [her] on fire."

¶ 30   On cross-examination, Brenda did not recall whether she told Detective Taylor that "there was no way [defendant] could molest the children because she only leaves approximately every two weeks to go to the store to get groceries." She recalled telling Detective Taylor that she "denied [defendant] was molesting the children in any way and indicated that [defendant] loves the children very much." Following Brenda's testimony, the trial court orally instructed the jury that some of Brenda's testimony constituted hearsay; however, a hearsay exception existed that allowed hearsay

11

to be admitted after the minor children testified. The court then provided the following limiting instruction:

"If a statement is admitted pursuant to this section, and that's the hearsay exception, the Court shall instruct the jury that it is for the jury to determine the weight and credibility to be given [to] the statement, and that in making that determination, the jury should consider the age and the maturity of the child, nature of the statement, the circumstances under which the statement was made, and any other relevant factor. You are so admonished."

¶ 31   D. Ms. Best

¶ 32   Next, the State called Ms. Best, who testified that she worked with C.V., a mildly mentally impaired student, on multiple occasions. Ms. Best clarified that C.V. functioned "several years below her chronological age," noting that C.V.'s mental age "would be probably around that of a seven-year-old, perhaps." Ms. Best also shared that C.V. had a difficult time "expressing time frames, number of incidences, that kind of thing." Despite her developmental disability, Ms. Best testified that C.V. could "remember events that occur[,] and she can tell a fairly accurate story, with the exception again of trying to pin down specific days or times or maybe number of occasions."

¶ 33   Ms. Best spoke individually with C.V. after C.V. asked a female classmate "if she could come home and live with her." Ms. Best subsequently spoke with C.V. in her office on March 15, 2005, at which time, C.V. admitted that she told her classmate that she wanted to live with her because "her dad was mean to her and that he would spank them on the behind and put them to bed early." C.V. specified that "dad" was defendant. C.V. also shared that defendant "liked to pat my kitty cat." C.V. then proceeded to place her hands on her lap near her pelvic area. Upon further inquiry, C.V. said that defendant "liked to play with it. *** [H]e likes to rub it[,] and he tries to

12

put his fingers up inside of me." Due to her developmental disability, Ms. Best did not ask C.V. when and how frequently defendant touched her; however, C.V. stated that defendant touched her at night in her bedroom. C.V. also told Ms. Best that defendant touched J.P. "in front of her."

¶ 34    According to Ms. Best, who had "extensive experience" working with elementary school aged children with intellectual functioning disabilities, C.V. relayed the above information in a calm manner. Ms. Best did not find this surprising, given C.V.'s age and the fact that she would not necessarily know that the information was provocative. In Ms. Best's opinion, C.V. "simply *** relat[ed] what was occurring to her." The State then asked Ms. Best if "there [was] anything that [C.V.] said or did on March 15th *** that made you think maybe she wasn't telling the truth?" Ms. Best responded, "Absolutely not." Following Ms. Best's testimony, the trial court, again, provided the same limiting instruction regarding hearsay that the court provided following Brenda's testimony.

¶ 35    E. Nurse Noelle Cope

¶ 36    Next, the State called Nurse Cope, a nurse practitioner with specialized training to perform sexual abuse examinations on pediatric and adult patients, who testified to the following. Nurse Cope testified that she had performed sexual abuse examinations on approximately 250 patients. Specific to this case, Nurse Cope performed a sexual abuse examination on J.P. on March 22, 2005. From the outset of the examination, J.P. indicated to Nurse Cope that she needed an examination because "defendant touched her inappropriately." J.P. further stated that defendant "had been trying to stick his fingers up in *** her front ***." J.P. articulated that her "front" was her "kitty." Nurse Cope testified to the following:

"I asked her what happened when he was doing this, and she replied that *** she was telling him to stop doing that. She had replied to me that he had told her to shut up,

13

you like it when I do this. You want me to do this to you. She said that she would say, No, and then he would keep doing it. She said that Mom would come in the room and visualize him doing this to her and she would tell him to leave her alone, and his response would be that this was his way of checking her to see if anybody else had ever messed with her in the past."

J.P. also informed Nurse Cope that she saw defendant "lift [C.V.'s] nightgown up and kiss her abdomen, her belly, and her lower privates, and she had remarked that the mother had also witnessed this happening." Moreover, J.P. told Nurse Cope that she witnessed defendant "twisting her brother's winkie and trying to finger him up the butt several times." J.P. clarified that a "winkie" was a penis. J.P. also reported that defendant tried to insert his penis into her "kitty on several different occasions; that it hurt, that she yelled at him numerous times to stop doing that, but that the activity had continued." Defendant also tried to put his penis in J.P.'s mouth on multiple occasions while she sat on the toilet. J.P. shared with Nurse Cope that her "[m]om would walk in the room and say, Leave her alone, [J.P.] is trying to go to the bathroom, but *** then [m]om would walk out of the room and the activity would continue." According to J.P., defendant usually abused her at night.

¶ 37    Nurse Cope highlighted that J.P.'s responses were age appropriate, and that both J.P. and C.V. had similar language for their private parts. The State then asked Nurse Cope whether she had any reason not to find J.P. credible, and she responded, "No, I did not." After the interview, Nurse Cope performed a sexual abuse examination of J.P. that came back "positive," which only occurred in three to five percent of cases. Nurse Cope specified that J.P. had a tear in her hymen, specific "for blunt penetrating trauma." Nurse Cope clarified that blunt penetrating trauma meant that something had to touch J.P.'s "hymenal tissue with force and attempt to enter the vaginal

14

opening to cause an injury like that." Nurse Cope testified that J.P.'s injury and statements were consistent.

¶ 38    Nurse Cope also interviewed and performed a sexual abuse examination on C.V., which came back "normal." During the interview, C.V. referred to her "front parts [as] her kitty cat ***." Nurse Cope asked if anyone made her feel uncomfortable or hurt her, and C.V. indicated that defendant "pull[ed] her pants down and play[ed] with her kitty cat." C.V. stated that "[defendant] would put her [*sic*] fingers up into her kitty cat and play with them in that way." C.V. stated that defendant did this to her "a lot." C.V. also told Nurse Cope that defendant tried to put his penis in her "kitty cat at one time." When Nurse Cope asked C.V. if "these sort[s] of activities hurt," C.V. answered "[y]es, very loudly." C.V. also told Nurse Cope that defendant put his penis in her mouth in her bedroom or the bathroom "until white stuff would come out onto the floor." C.V. relayed that sometimes her mother was home when defendant touched her. C.V. also shared that she saw defendant touch J.P. and J.V. Nurse Cope believed C.V. used age appropriate language. She also testified that C.V.'s physical findings were consistent with her statements. The State then asked Nurse Cope if she believed there was "anything about [her] interview or physical" examination of both C.V. and J.P. that "led [her] to believe that" C.V. and J.P. were not "telling the truth." Nurse Cope stated, "No." Following Nurse Cope's testimony, the trial court, again, provided the above-mentioned limiting instruction concerning hearsay.

¶ 39    F. Detective Taylor

¶ 40    Detective Taylor testified that he had specialized training interviewing children regarding sexual abuse. Detective Taylor interviewed J.P. on March 15, 2005, after the department received a report that J.P.'s stepfather had molested her. During the interview, J.P. told Detective Taylor that she did not like defendant because he spanked her and her siblings for no reason. Defendant

15

also made J.P. feel uncomfortable when he "trie[d] to place or does place his fingers into what she referred to as her kitty cat." Detective Taylor specified that defendant placed his middle finger into J.P.'s vagina as a "way of seeing whether or not she had been 'messed with.' " Defendant touched J.P. this way in her bed at night on 11 or 12 occasions. Defendant also placed his tongue in J.P.'s vagina eight to nine times in the last six months and penetrated her vagina with his penis on one occasion in the last six months. J.P. also shared that defendant pulled down her pants against her will when "he was drunk and reeking of alcohol." Detective Taylor testified that, although J.P. complained to her mother on multiple occasions, Brenda never stopped defendant. As such, defendant continued to touch J.P. against her will. Detective Taylor testified that, based on his training and experience, nothing about J.P.'s language or demeanor made him feel that she was lying. Rather, he "thought [J.P.] was very, very credible, in my opinion." Following the State's case-in-chief, defendant's trial counsel made a motion for directed verdict, which the trial court denied following argument by the parties.

¶ 41 Defendant then called Katrina Jenkins, defendant's ex-wife, who testified on defendant's behalf. Jenkins testified that her and defendant were married for approximately nine years and had one son together. Jenkins had full custody of their son, but she let defendant see him. According to Jenkins, defendant had a good reputation as a moral person. On cross-examination, Jenkins testified that her opinion about defendant's reputation was based on her belief that "[defendant was] good with everybody's kids." The defense rested.

¶ 42 During closing arguments, the State argued that the testimonies of J.P. and C.V. "all make[ ] sense." The State proceeded to state:

"And I think seeing that it makes sense tells us that these girls aren't making this up. They haven't told wildly vague stories to different people. They told a consistent story over and

16

over again. Each of them. Is it exactly the same every time? No. Do they forget some things or remember other things? Yes.

I believe from the testimony of Mrs. Cope and Detective Taylor and of Tina Best and even of Mrs. Steffens, the girls told them, all four of them, much more back on March 15th and in the few weeks after that than they told you yesterday. Is that a reason not to believe them? I would say no. That's not a reason not to believe them. There are reasonable explanations for why their testimony was different. And it's not that they were lying."

The State further asserted the following: "I believe [C.V.] told us the truth. I believe she told Noelle Cope the truth back in March. I believe she told Tina Best the truth back in March. And I believe the girls told their mom the truth, and [J.P.] told [Detective] Taylor the truth." The State stated that Nurse Cope believed C.V.'s statements were credible. Defense counsel did not object to the State's statements. Following closing arguments, the jury found defendant guilty of all six counts of predatory criminal sexual assault of a child. On September 19, 2005, the trial court sentenced defendant to mandatory natural life in prison.

¶ 43 On October 14, 2005, defendant, represented by trial counsel, Attorney Lonnie L. Lutz, filed a timely motion for a new trial and/or arrest of judgment. In his motion, defendant argued that the State failed to prove him guilty beyond a reasonable doubt, and that the jury verdict was contrary to the law and evidence, against the manifest weight of the evidence, and based on insufficient and inadequate evidence. Defendant also argued that he was denied due process of law and that the sentencing provision mandating a term of natural life in prison did not provide the trial

17

court the opportunity to consider defendant's likelihood for rehabilitation. The record confirms that Attorney Lutz never requested a hearing on defendant's motion for a new trial.[2]

¶ 44    On April 16, 2021, defendant, represented by Attorney Anthony Ortega, filed a motion for acquittal or, alternatively, a motion for a new trial. Specific to this appeal, defendant argued that the State asked Ms. Best, Nurse Cope, and Detective Taylor on direct examination to improperly vouch for J.P. and C.V.'s credibility. In addition, defendant asserted that the prosecutor improperly expressed her personal belief during closing argument that J.P. and C.V. told the truth. Defendant argued that the trial court erred in denying defendant's motion for directed verdict, and that the jury's finding of guilt was against the manifest weight of the evidence.

¶ 45    On March 22, 2023, defendant, represented by Attorney Matthew Ham, filed a supplemental motion for acquittal or, alternatively, a motion for a new trial. Defendant argued that defense counsel rendered ineffective assistance of counsel for failing to investigate and present a defense based on Jenkins's testimony and also object to "arguments and testimony at the trial," as set forth in the April 16, 2021, motion for acquittal or a new trial.

¶ 46    On June 14, 2023, the trial court held a hearing on defendant's posttrial motions. At the hearing, Attorney Ham called Jenkins, defendant's ex-wife, who testified to the following on defendant's behalf. After Jenkins and defendant divorced in early 2000, Jenkins and defendant remained friends. Jenkins testified that she informed Attorney Lutz that she "had information on [defendant's] case," so Attorney Lutz asked her to meet him 15 minutes before she testified. According to Jenkins, Attorney Lutz ran late to court and was unable to communicate with Jenkins prior to her testimony in 2005. She testified that she wished to tell Attorney Lutz that the "day

[2]The report of proceedings indicates that Attorney Lutz left the public defender's office shortly after filing defendant's October 14, 2005, motion for a new trial. After defendant filed a section 2-1401 petition on April 24, 2020, the trial court discovered this issue.

after [defendant] was arrested, [she] went to [defendant and Brenda's] house, and another guy answered the door. And I was informed that that was Brenda's new fiancé." Jenkins also testified that defendant and Brenda had custody of J.P. because Brenda's ex-husband molested J.P. and served a prison sentence for his actions. Jenkins acknowledged that she testified at defendant's jury trial; however, she did not have the opportunity to communicate this new information to Attorney Lutz prior to her testimony.

¶ 47 Following witness testimony, Attorney Ham argued that the State improperly "interject[ed] a personal opinion" in closing arguments. Attorney Ham further asserted that the State "improperly bolstered the arguments of every single witness that i[t] called," essentially "tak[ing] the determination of the credibility of the witnesses away from the jury, which is plain error." Moreover, Attorney Ham contended that Attorney Lutz rendered ineffective assistance for failing to object to these errors. Following argument by the parties, the trial court determined that the court properly admitted the witness statements at the section 115-10 hearing in 2005. In addressing defendant's supplemental motion, the court found that Jenkins's testimony would not have impacted defendant's case, thus, Attorney Lutz did not render ineffective assistance of counsel for failing to interview her prior to defendant's trial.

¶ 48 The trial court, however, determined that Attorney Lutz rendered ineffective assistance of counsel in several respects, including that Attorney Lutz failed to (1) notice up defendant's October 14, 2005, motion for a new trial and/or arrest of judgment; (2) object to witness testimony that bolstered other witness testimony; and (3) object to the State's improper comments during closing argument. Specific to the State's comments during closing argument, the court stated the following on the record: "I mean, that's troubling. It's always troubling when a prosecutor makes an improper argument. *** I can't say that *** Mr. Lutz handled it completely inappropriately by

19

simply hoping it's glossed over and not emphasized. But it is concerning." Specific to Attorney Lutz's ineffectiveness for not objecting to witness testimony, which the court believed bolstered the credibility of J.P. and C.V., the court questioned whether the error amounted to plain error. In reasoning that harmless error occurred in the instant case, the court noted that "[t]he evidence of guilt *** was substantial and strong and not closely balanced." As such, the court reasoned that, despite Attorney Lutz's failure to object, defendant did not suffer substantial prejudice as a result. The court subsequently denied defendant's motion, and defendant filed a timely notice of appeal.

¶ 49                                    II. Analysis

¶ 50    Defendant argues on appeal that the State improperly elicited the opinions of Ms. Best, Nurse Cope, and Detective Taylor regarding the credibility of J.P. and C.V. Defendant also argues that the State aggravated this error when the prosecutor expressed her own personal belief during closing argument that J.P. and C.V. told the truth. Initially, we note that defendant forfeited each of these claims of error by failing to object at trial. Defendant argues, however, that this court should consider his claims as ineffective assistance of counsel or, alternatively, under the first prong of the plain-error doctrine.

¶ 51    We first address defendant's ineffective assistance of counsel argument. Defendants have a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Constitution of Illinois. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Claims of ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*). "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S.

20

at 687). "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (citing *Strickland*, 466 U.S. at 694).

¶ 52    Importantly, the State concedes on appeal that the prosecutor improperly elicited opinion testimony when the prosecutor asked Ms. Best, Nurse Cope, and Detective Taylor to provide their opinions regarding the credibility of J.P. and C.V. Because questions of witness credibility are to be resolved by the trier of fact (*People v. Kokoraleis*, 132 Ill. 2d 235, 264 (1989)), it is well-established that it is improper to ask one witness to comment directly on the credibility of another witness (*People v. Becker*, 239 Ill. 2d 215, 236 (2010)). In addition, the State concedes that the prosecutor improperly offered her own personal belief during closing argument that the minor children told the truth. "Prosecutors are afforded wide latitude in closing argument" (*People v. Wheeler*, 226 Ill. 2d 92, 123 (2007)); however, "[i]t is prejudicial error for the prosecutor to express personal beliefs or opinions, or invoke the integrity of the State's Attorney's office, to vouch for the credibility of a prosecution witness" (*People v. Lee*, 229 Ill. App. 3d 254, 260 (1992)). A detailed review of the challenged portions of the prosecutor's closing argument demonstrates that she improperly expressed her own personal opinion as to J.P. and C.V.'s credibility. Moreover, the State acknowledges, similar to the trial court at the June 14, 2023, hearing, on defendant's posttrial motions, that Attorney Lutz rendered deficient performance by failing to object to the prosecutor's above-mentioned errors. Despite the State's concessions concerning the prosecutor's errors and Attorney Lutz's failures, the State argues that defendant did not suffer prejudice. We agree with the State.

¶ 53    The State's evidence against defendant was overwhelming and did not solely amount to a credibility contest between defendant and the victims, J.P. and C.V. Here, there were not multiple, varying accounts. There were only the two minor victims' accounts, wherein J.P. and C.V. consistently reported that defendant touched them every night in their shared bedroom. J.P. and C.V. consistently used the same language to describe their vaginas as their "kitty cat[s]" before they specified how, when, and where defendant individually touched them. For instance, J.P. testified that defendant, on multiple occasions, placed his finger in, and his mouth on, her vagina, and that he also attempted on one occasion to insert his penis into her vagina. J.P. also testified where defendant touched her. In particular, she indicated that defendant usually inserted his finger in her vagina while she was in her bed; that he attempted to insert his penis inside of her vagina on a sectional couch in the living room; and that he touched his tongue to her vagina in the bathroom after she showered. J.P. detailed that, as she tried to exit the tub following her shower, defendant pushed her back and made her sit down on the ledge of the tub. During this interaction, defendant placed his hands on the walls of the tub to hold himself up as he touched his tongue "around the inside part of" her vagina.

¶ 54    Importantly, J.P. testified that defendant also touched C.V. She recalled an instance in the living room when defendant had his hand "up [C.V.'s] nightgown and was messing around with her underwear and around her chest area, around her stomach." Similar to J.P., C.V. testified that defendant, on multiple occasions, inserted his middle finger into her vagina at night. She specified that defendant came into the bedroom she shared with J.P. and touched her in bed. At the time of C.V.'s testimony, the trial court and parties were aware of C.V.'s developmental disability, as previously testified to by Ms. Best and Detective Taylor at the section 115-10 hearing. Although C.V.'s trial testimony regarding defendant inserting his penis into her vagina or other body parts

was hard to follow and inconsistent at times, Nurse Cope testified that C.V. provided specific details of defendant's inappropriate sexual touching. Specifically, C.V. told Nurse Cope that defendant tried to put his penis in her "kitty cat at one time" and also put his penis in her mouth in her bedroom or the bathroom "until white stuff would come out onto the floor." Moreover, C.V. also reported to Ms. Best that defendant "likes to pat my kitty cat," and that defendant "liked to rub it[,] and tr[ied] to put his fingers up inside of her." Both J.P. and C.V. indicated that defendant touched them when their mother was home.

¶ 55 Additional witness testimony corroborated J.P. and C.V.'s testimonies. In particular, Brenda testified that J.P. told her several times that defendant's touching made her feel uncomfortable. On one occasion, Brenda was in the bathroom with J.P. when defendant entered the bathroom and asked J.P. to "suck" his penis. Moreover, Brenda, who pled guilty for permitting defendant's sexual assaults of her female children in her home, testified that she saw defendant "put[ ] his hand up [J.P.'s] shorts and up her T-shirt." Brenda did not speak up at that time, later sharing that she feared defendant would kill her and her children. She recalled, however, that J.P. "just looked at me like, Mom, please help." In addition, according to Nurse Cope, J.P.'s sexual examination revealed a "positive physical finding"—a finding that occurred in only three to five percent of cases—which showed a tear to her hymen specific "for blunt penetrating trauma." Nurse Cope clarified that blunt penetrating trauma meant that something had to touch J.P.'s "hymenal tissue with force and attempt to enter the vaginal opening to cause an injury like that." Nurse Cope testified that J.P.'s injury was consistent with her statements of abuse. Moreover, the record demonstrates that J.P. testified consistently with her March 2005 taped interview, wherein she reported to Detective Taylor that defendant put his fingers in her vagina, placed his tongue on the inside part of her vagina on multiple occasions, and also slightly inserted his penis into her vagina

23

on one occasion. Importantly, Detective Taylor testified that J.P. informed him that defendant stuck his middle finger into her vagina, which was consistent with C.V.'s testimony at trial that defendant also stuck "his middle finger up [C.V.'s] private." Specific to C.V., Nurse Cope believed that C.V. used age-appropriate language, and that despite normal physical findings, Nurse Cope found C.V.'s physical findings consistent with her statements of abuse.

¶ 56    Accordingly, based on overwhelming evidence demonstrating defendant's guilt, defendant has failed to show that a reasonable probability existed that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Accordingly, where defendant has failed to demonstrate prejudice, we cannot conclude that defense counsel's performance amounted to ineffective assistance of counsel. Importantly, our supreme court has ruled that the analysis under the closely balanced prong of the plain-error doctrine is similar to the analysis for prejudice under a claim of ineffective assistance of counsel. *People v. White*, 2011 IL 109689, ¶¶ 133-34. Having determined that defendant cannot show prejudice, we conclude that defendant's claims as to the prosecutor's errors under first-prong plain error are meritless.

¶ 57                                III. Conclusion

¶ 58    For the reasons stated, we affirm defendant's conviction and sentence on six counts of predatory criminal sexual assault of a child.

¶ 59    Affirmed.